## DAVID S. DEMPSEY
### v.
## JESSE WHITESIDE.

*Money Had and Received—Conflict of Evidence—Trial without a Jury—Finding—Discretion—Evidence:*

1. In an action for money had and received, alleged to have been left with the defendant to be applied in the payment of certain promissory no!, s. this court, upon a review of the evidence, which is sharply conflicting, sustains the finding of the court below for the plaintiff.

2. The finding of the court, when acting without a jury, is to be accorded the same weight as the verdict of a jury, and to be judged by the same rules.

3. This court can neither reverse because the evidence is conflicting, nor because it seems to be equally balanced.

4. It is not a sufficient ground for reversal that a leading question was asked the plaintiff in rebuttal, the objection at the time being general. Such matters are largely in the discretion of the trial court.

5. In the case presented, certain evidence was properly excluded as too remote.

[Opinion filed February 21, 1889.]

APPEAL from the Circuit Court of McLean County; the Hon. O. T. REEVES, Judge, presiding.

Mr. ISAAC N. PHILLIPS, for appellant.

Messrs. JOHN E. POLLOCK and A. J. BARR, for appellee.

WALL, P. J. This was an action of assumpsit on the common count for money had and received, brought by the appellee against the appellant. The cause was tried by the court, a jury being waived, and a judgment was rendered for the plaintiff for $572.50, from which an appeal has been prosecuted to this court by the defendant.

. The claim of the plaintiff was, that the money sued for had been left with the defendant, to be applied on the payment of two promissory notes, one of $100, to Anna L. Ewing, the

Dempsey v. Whiteside.

other of $445, to Maggie E. Ewing. These notes were for money loaned, and had been transmitted to the payees therein, who resided in Pennsylvania, through the defendant, who was a merchant at Armington, in Tazewell county, Illinois, and through whom the loans were negotiated.

It was claimed that the first payment of $472 was made on the 9th of June, 1884, to cover the larger note, which then amounted to something over $460, and some other items, and that the second payment was made on the 16th of June, 1886, to cover the smaller note. The money, if received by the defendant, was not applied by him to the payment of the notes. The plaintiff claimed that these payments were made through or by the agency of his son, James, who is the chief witness for the plaintiff, and who produced on the trial certain receipts purporting to have been signed by the defendant, specifying that the money was received for the purpose alleged. The defendant denied that the receipts were genuine in the condition then appearing, although he was compelled to admit that the signatures were his, or were so much like his that he could not deny them. The theory of counsel is that the receipts were probably given for some other purpose in the course of the numerous dealings between the parties, and being written in pencil, had been altered, the signatures traced in ink and the body of the instruments filled up as they now are. There was no expert or other evidence *aliunde* as to the character and genuineness of these writings, and the evidence on this point consisted of the testimony of the parties, upon which, and the inspection of the writings, the court must have reached the conclusion they were genuine.

There was much other testimony, some corroborating each side, and it must be said the proof is in a state of hopeless conflict. One side or the other has sworn falsely as to these receipts and the payments. There is no room for mistake or misapprehension.

It is not worth while to attempt a statement of all this proof. The case was argued orally, and we have read carefully the entire body of the evidence as it appears in the record,

the stenographic report having been copied in full in the
bill of exceptions, and we are unable to say on which side is
the greater weight.   Convinced that there must be perjury
on one side or the other, it is impossible for us to determine,
with any degree of confidence, which is the guilty party.

It is one of those cases where it would be of great assist-
ance to see and hear the witnesses, observe their manner, and
note the various circumstances of corroboration or impeach-
ment which can not be put upon paper.

Our attention is called by the respective counsel to various
discrepancies in the details of the testimony of the principal
witnesses, and, after giving these all due consideration, we do
not feel at liberty to say that the finding of the court is so
palpably against the weight of the evidence as to justify a
reversal.   That finding is to be accorded the same weight as
the verdict of a jury, and to be judged by the same rules.
Remembering what advantage the court possessed for reach-
ing the truth, in that it had the witnesses personally before
it, we can not hold that the conclusion arrived at is erroneous.

Perhaps the judgment does great wrong to the appellant,
but if so it is because the evidence is of such a character as to
successfully baffle all effort to expose its falsity.   It is the
common experience that in such a conflict of testimony, when
we have seen the witnesses face to face, and heard them
through long examinations and cross-examinations, we usually
feel confident in our conclusions as to which is true and which
is false; and so here, it is to be presumed, there were in this
evidence such badges and indications as to lead the mind of
the judge who heard it, to a result which he was satisfied with.
We can not reverse because the testimony was conflicting,
nor because there is the same *quantum* of proof on either
side; for since it is in conflict, one is right and the other is
wrong; and so it was the province of the trial court to rec-
oncile it, if possible, and if not, to believe that side which
seemed, in view of all the evidence, direct and corroborating,
to be the more worthy of credit.

It is urged by appellant that the court erred in refusing
to permit proof that James Whiteside, son of the plaintiff,

was " broke " before he negotiated the draft of $472 to appellant, Dempsey, and afterward he was " flush." This was not very important. It appeared that the $472 draft was part of a loan of $2,000 which plaintiff had just negotiated through the defendant, by whom the other part of the loan, consisting of drafts for $1,500, was received by plaintiff, and if James was " flush" he might have got the money from the proceeds of the other drafts. The offered evidence was too remote to throw any effective light upon the case.

It is also objected that the court refused to permit proof that there was no bank at Armington, and that the defendant was accustomed to cash drafts for parties at his store. This was also quite remote; nor can we see how it could have helped the case of defendant, as he was not claiming that he cashed the draft, in the sense suggested by the offered proof.

" He claimed that he took the draft from James Whiteside, and after giving credit upon his books for what was then due him from James and his father, the plaintiff, gave him the, balance in money."

It is also urged the court erred in refusing to permit the witness Guy to answer questions which went to prove that James Whiteside was in the habit of signing his father's name to commercial paper; and, in support of the point, counsel say there was a dispute between James Whiteside and Dempsey, as to which of them indorsed the name of Jesse Whiteside, the plaintiff, on the $472.50 draft.

Now it was not pretended that the name of Jesse Whiteside was indorsed on this draft, although it was really payable to him. The names indorsed on that draft are those of James Whiteside and D. S. Dempsey.

On turning to the testimony of Guy as it is set out in the record we find it does not appear what paper was being shown the witness, but it was a draft on which James had, in July of last year, written in the name of Jesse Whiteside, and when the witness was asked what James said at the time of writing it as to how he happened to do that, an objection was interposed and the court remarked that nobody was disputing what James did, but they claimed he was acting for his father.

It must be apparent this objection is not well taken, and that the court would not have been affected by the proof offered, even if, as does not appear, it was what counsel seem in the brief to suppose it was, and even if, as was not the fact, the name of Jesse Whiteside is upon the back of the draft.

It is also objected the court permitted counsel to ask the following leading question of the plaintiff when called in rebuttal: " But there was a receipt shown you as in payment of that note?" to which the reply was "Yes, sir." This question was but a mere statement or repetition, in the form of an interrogatory, of what the witness had more fully stated in the preceding answer. While the question was objected to, there was no suggestion that the objection was on account of the form. Had it been urged the question was leading, the court would probably have required the form to be changed. Such matters are too much in the discretion of the court to justify a reversal, unless the discretion has been palpably abused to the manifest injury of the party complaining.

That was plainly not so in this instance, and the point made must be overruled.

No other points are presented in the argument, and the judgment of the Circuit Court must be affirmed.

*Judgment affirmed.*